UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                                         |   |                                    |
|-----------------------------------------|---|------------------------------------|
| THOMAS HAMANN,                          | * |                                    |
|                                         | * |                                    |
| Plaintiff,                              | * |                                    |
|                                         | * |                                    |
| v.                                      | * |                                    |
|                                         | * | Civil Action No. 17-cv-11292-ADB   |
| STUART A. CARPENTER, LESLIE H.          | * |                                    |
| WEXNER, and COPLEY MOTORCARS            | * |                                    |
| CORPORATION,                            | * |                                    |
|                                         | * |                                    |
| Defendants.                             | * |                                    |

**<u>MEMORANDUM AND ORDER ON MOTION TO DISMISS</u>**

BURROUGHS, D.J.

Plaintiff Thomas Hamann, the exclusive sales agent for a 1953 Ferrari 375MM Pininfarina Spyder (the "Ferrari"), lost out on a sizeable commission when the buyer switched lanes and dealt directly with the seller. The Court dismissed Hamann's first complaint with leave to amend, and Hamann then filed the instant five-count Amended Complaint. Hamann asserts claims for tortious interference with contractual and business relations, and for related vicarious liability, against Defendants Stuart A. Carpenter, who purchased the Ferrari, Leslie H. Wexner, the principal on whose behalf Carpenter negotiated the sale, and Copley Motorcars Corporation ("Copley"), a car dealership owned by Carpenter.[1] Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim. [ECF No. 35]. Although the Court sympathizes with Plaintiff and agrees that the underlying conduct might have been less

---

[1] Hamann brings claims for tortious interference with business relations (Counts I and III) and tortious interference with contractual relations (Counts II and IV) against Carpenter and Copley. Count V asserts that Wexner is liable for the tortious conduct alleged in Counts I–IV based on a theory of respondeat superior. [ECF No. 34] ("Amended Complaint" or "Compl."). Although Hamann has added some supplemental factual assertions to his Amended Complaint, these are essentially the same legal claims that Hamann brought in his first complaint and that were dismissed.

than honorable, the Court GRANTS Defendants' motion and DISMISSES the Amended Complaint without leave to amend.

I.     BACKGROUND

The following allegations in the Amended Complaint are accepted as true for the purposes of evaluating the motion to dismiss. Ruivo v. Wells Fargo Bank, 766 F.3d 87, 90 (1st Cir. 2014). Hamann was, at all relevant times, in the business of purchasing and selling high-end motor vehicles in Connecticut. Compl. ¶ 1. On behalf of an individual named Vincenzo Scandurra, who lived in Monaco, Italy, Hamann acted as the exclusive sales agent for a Ferrari. Id. ¶¶ 2, 9–12. The Ferrari was originally part of the collection of Emilio Gnutti in Brescia, Italy; Scandurra, who intended to sell the Ferrari, agreed to purchase it from Gnutti and paid a deposit. Id. ¶¶ 9–10. Scandurra informed Hamann that he was under significant pressure to find a buyer for the Ferrari in order to have the funds necessary to make the final payments owed to Gnutti. Id. ¶ 12.

On or about July 21, 2013, Hamann informed Carpenter of his exclusive sales agreement and offered to broker a sale of the Ferrari to him for $15 million. Id. ¶ 5. Carpenter responded that neither he nor his principal, Wexner, was interested in purchasing the Ferrari. Id. ¶ 8. Shortly thereafter, Hamann secured an offer of $10.5 million from a different prospective buyer, Dana Mecum, and Scandurra instructed Hamann to complete the sale to Mecum. Id. ¶ 13. Hamann then executed an agreement with Scandurra on Mecum's behalf for the purchase of the Ferrari, and Hamann sent a deposit of €2 million to Scandurra on August 28, 2013. Id. ¶¶ 13–14.

At some point in late August, Carpenter (acting on Wexner's behalf) arranged to purchase the Ferrari directly from Scandurra and used a dealership in Milan to arrange the sale. Carpenter managed to secure the sale by threatening to interfere with Scandurra's business

2

relationship with Gnutti, who owned a collection of cars and was a source of potential future business for Scandurra, if Scandurra declined to sell the Ferrari to him. Id. ¶ 29–30.

On August 30, 2013, Scandurra told Hamann that a third party, the owner of a dealership in Milan, had contacted Gnutti directly and offered approximately $12.5 million to purchase the Ferrari and that Scandurra planned to sell the Ferrari to this new buyer. Id. ¶¶ 16–18.

Upon learning that Carpenter was involved in the purchase, Hamann immediately sent Carpenter an email, advising him that Hamann's client had previously contracted to purchase the Ferrari and made a down payment. Id. ¶ 19. He followed up with additional emails and phone calls to remind Carpenter that Hamann was the exclusive sales agent for the Ferrari. Id. ¶¶ 20–24. On Tuesday September 3, 2013, after not responding to several of Hamann's communications over Labor Day weekend, Carpenter responded that he did not think Hamann had the exclusive sales rights to the Ferrari because "seven other dealers would have offered him the [Ferrari] after [Hamann] for the same price." Id. ¶ 25. Because the sale of the Ferrari to Mecum was not completed, Hamann asserts that he lost a commission of €550,000 as a result of Defendants' interference with his exclusive sales agreement with Scandurra and with the contract he had negotiated for Mecum's purchase of the Ferrari. Id. ¶ 34.

## II. LEGAL STANDARD

On a motion to dismiss for failure to state a claim, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the light most favorable to the plaintiff. United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011). While detailed factual allegations are not required, the complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and it must contain "factual allegations, either direct or inferential, respecting each material element

necessary to sustain recovery under some actionable legal theory." Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (internal quotations and citations omitted). The facts alleged, taken together, must "state a claim to relief that is plausible on its face." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Twombly, 550 U.S. at 570). "A claim is facially plausible if supported by 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Eldredge v. Town of Falmouth, 662 F.3d 100, 104 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

When assessing the sufficiency of a complaint, the Court first "separate[s] the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Maddox, 732 F.3d at 80 (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). Next, the Court "determine[s] whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" Maddox, 732 F.3d at 80 (quoting Morales-Cruz, 676 F.3d at 224). "[T]he court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Twombly, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," however, a claim may be dismissed. Iqbal, 556 U.S. at 679.

## III. DISCUSSION

Defendants move, as they did with respect to Hamann's first complaint, to dismiss the claims for tortious interference with contractual and business relations against Carpenter and Copley (Counts I through IV) on the grounds that the Amended Complaint fails to plausibly

4

allege that Defendants acted with improper means or motive or that their conduct caused any damages. See Hamann v. Carpenter, No. 17-CV-11292-ADB, 2018 WL 2012689, at *2 (D. Mass. Apr. 30, 2018). Hamann's respondeat superior claim (Count V), which seeks to hold Wexner liable for Carpenter and Copley's tortious acts, collapses if the allegations in support of Counts I−IV are insufficient. Id.; see also Sullivan v. Trustees of Boston Univ., 46 N.E.3d 599 (Table), 2016 WL 873036, at *2 n.9 (Mass. App. Ct. Mar. 8, 2016) ("Where all underlying tort claims failed, the plaintiff's respondeat superior claim . . . also failed."); cf. O'Brien v. Milano, 75 N.E.3d 1148 (Table), 2017 WL 121069, at *2 (Mass. App. Ct. Jan. 12, 2017) (no basis for respondeat superior claim against employer where employee committed no tortious act).

To state a claim for tortious interference with contractual relations, the plaintiff must plausibly allege that:

> (1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract [by inhibiting the third party's or the plaintiff's performance thereof, depending on the theory]; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.

O'Donnell v. Boggs, 611 F.3d 50, 54 (1st Cir. 2010) (quoting Harrison v. NetCentric Corp., 744 N.E.2d 622, 632 (Mass. 2001)). A claim for tortious interference with business relations requires a similar set of elements: "(1) the plaintiff was involved in a business relationship or anticipated involvement in one, (2) the defendant knew about the relationship, (3) the defendant intentionally interfered with the relationship for an improper purpose or by an improper means and (4) the plaintiff suffered damages as a result." Int'l Floor Crafts, Inc. v. Adams, 477 F. Supp. 2d 336, 339 (D. Mass. 2007) (citing Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B., 815 N.E.2d 241, 245 (Mass. App. Ct. 2004)).

The central question is, once again, whether Hamann has plausibly alleged that Defendants' conduct was improper in means or motive. "Improper" requires "something more

5

than intentional interference," United Truck Leasing Corp v. Geltman, 551 N.E.2d 20, 23 (Mass. 1990), and may require "'actual malice,' *i.e.*, a 'spiteful, malignant purpose, unrelated to the legitimate corporate interest.'" Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 864 N.E.2d 518, 541 (Mass. App. Ct. 2007) (quoting Shea v. Emmanuel Coll., 682 N.E.2d 1348, 1351 (Mass. 1997)). "Improper means can include 'violation of a statute or common-law precept, e.g., by means of threats, misrepresentation or defamation' including 'misrepresent[ation] of facts.'" Corp. Techs., Inc. v. Harnett, 943 F. Supp. 2d 233, 242 (D. Mass. 2013) (quoting Cavicchi v. Koski, 855 N.E.2d 1137, 1142 (Mass. App. Ct. 2006)); see TalentBurst, Inc. v. Collabera, Inc., 567 F. Supp. 2d 261, 269 (D. Mass. 2008) (improper means include "making fraudulent statements or threats"). The "legitimate advancement of [the defendant's] own economic interest," however, is not considered improper. Pembroke Country Club, Inc., 815 N.E.2d at 246; see United Truck Leasing, 551 N.E.2d at 24 (noting that defendant's motive "to benefit his customers and himself financially" was not improper).

The Court previously held that Hamann's allegations that Carpenter was aware of his exclusive right to sell the Ferrari but nonetheless directly negotiated with Scandurra did not suffice for improper means or motive, especially given that Carpenter said he did not believe that Hamann had the exclusive right to sell the Ferrari. The Court noted that Carpenter's actions are consistent with his economic self-interest. Carpenter declined Hamann's offer of $15 million, and then offered $12.5 million directly to the Scandurra, thereby cutting Hamann out of the transaction. The $12.5 million offer from Carpenter was $2 million more than Mecum offered and the best offer Scandurra received. The reasonable inference is that Defendants simply sought to "'eliminate the middleman' and save money." TalentBurst, 567 F. Supp. 2d at 269 (granting motion to dismiss tortious interference claims against defendant company for hiring the

employee of its consultant, where all the company did was recruit the employee and offer him a job).

Hamann attempted to rectify his pleading deficiencies by alleging that "at all relevant times herein, Carpenter bore ill will and spite toward Hamann, and personally communicated that to Hamann," and that Carpenter threatened to go directly to Gnutti in an effort to pressure Scandurra to sell the Ferrari directly to Carpenter, which caused Scandurra to breach his agreement with Hamann. Compl. ¶¶ 29, 33.[2] The allegation that Carpenter "bore ill will and spite toward Hamann" is conclusory, and the remaining allegations do not plausibly suggest that Defendants acted out of malice as opposed to economic self-interest.

Hamann argues that his allegation of ill will and spite is not conclusory because he asserts that Carpenter "personally communicated" those feelings to Hamann at some unspecified time. Id. ¶ 33; [ECF No. 38 at 6]. The Amended Complaint, however, does not explain the basis for the alleged ill will and spite, nor does it describe any communication in which ill will and spite were expressed. The only alleged communications from Carpenter to Hamann were his July 2013 email stating that "he did not have any interest in [the] Ferrari" and his September 3, 2013 statement that "he didn't have the feeling that plaintiff had the exclusive sales rights." Compl. ¶¶ 8, 25. Those statements are insufficient to make out a plausible showing of ill will.

With respect to the allegation that Hamann threatened Scandurra, the Amended

---

[2] Hamann filed an affidavit before the Court dismissed his first complaint in which he attests that "Carpenter pressured and induced Scandurra to sell" the Ferrari. [ECF No. 18 at ¶ 18]. The Court declined to consider the affidavit in its order of dismissal because it was "an inappropriate means of injecting allegations into the pleadings and may not be considered when deciding a motion to dismiss under Rule 12(b)(6)." Hamann, 2018 WL 2012689, at *3. The Court is not considering the affidavit for the purpose of the instant motion to dismiss either, but notes that there are inconsistencies between the affidavit and the subsequently filed Amended Complaint. Compare [ECF No. 18 ¶ 10] (attesting that Scandurra told Hamann on August 30, 2013 that he had received an offer of €9.9 million for the Ferrari) with Compl. ¶ 16 (asserting that the same offer was for €9.0 million).

Complaint alleges no facts from which any inference could be drawn that these "threats" were anything more than a negotiation tactic. Tough negotiating is insufficient to show tortious interference with a business relationship. See Cook & Co. Ins. Servs. v. Volunteer Firemen's Ins. Servs., 657 F. App'x 1, 2 (1st Cir. 2016) (affirming dismissal of a tortious interference claim based on strategically hiring away employees at inopportune times and poaching customers where that conduct reflected no more than "maneuvering to gain advantage . . . in the marketplace and the use of bare-knuckle tactics to achieve that goal"); GMI New Eng. v. New Eng. Tech. Assocs., 95-0412, 1997 Mass. Super. LEXIS 293, at *10 (Mass. Super. Ct. July 15, 1997) ("With respect to a claim of intentional interference with contract, persuasion, even if aggressive, is not an improper means." (citing Dowd v. Iantosca, 538 N.E.2d 33, 38 (Mass. App. Ct. 1989))).

Hamann also added the allegation to the Amended Complaint that Carpenter's interference with his contracts constituted "an unfair method of competition or an unfair or deceptive act or practice," and as such, was a violation of Chapter 93A, Section 11. Compl. ¶ 37; see also Mass. Gen. Laws ch. 93A § 11. Although Hamann has not asserted an independent claim under Chapter 93A, he argues that if Carpenter violated Chapter 93A, that statutory violation can be used to demonstrate the "unlawful means" required for his tortious interference claims. See [ECF No. 38 at 5].

Hamann's assertion that Carpenter and Copley engaged in unfair practices, including an unfair method of competition, fails to allege a violation of Chapter 93A, Section 11 because Massachusetts law evaluates "unfair practices" in reference to other statutes, the common law, and rules promulgated by the Massachusetts Attorney General. See Mass. Gen. Laws ch. 93A § 2 (instructing courts to construe "[u]nfair methods of competition and unfair or deceptive acts

8

or practices" consistent with interpretations by the Federal Trade Commission and the Federal Courts of the Federal Trade Commission Act, and with rules and regulations promulgated by the Massachusetts Attorney General); 940 Mass. Code Regs. 3.16 (ruling that conduct violates Chapter 93A if it "fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth"). The deficiencies in Hamann's tortious interference claims are also fatal to the alleged violation of Chapter 93A because Hamann has not alleged a violation of Chapter 93A independent of the alleged tortious interference.

Additionally, Hamann's assertion that Carpenter and Copley engaged in "an unfair or deceptive act or practice" fails because Hamann did not engage in a commercial transaction with Carpenter or Copley. A claim under Chapter 93A Section 11 generally requires "not only that the defendant's conduct occur in 'trade or commerce' but also that there be a commercial transaction between the parties." Rafferty v. Merck & Co., 92 N.E.3d 1205, 1223 n.7 (Mass. 2018); see Linkage Corp. v. Trustees of Boston Univ., 679 N.E.2d 191, 206–07 (Mass. 1997) ("Chapter 93A, § 11 requires that there be a commercial transaction between a person engaged in trade or commerce and another person engaged in trade or commerce." (punctuation omitted)). See TalentBurst, 567 F. Supp. 2d at 269 n.6 ("[A]n argument that TalentBurst [the plaintiff] adequately states a tortious interference claim because it asserts a chapter 93A claim would be circular because one of the 'unfair and deceptive trade practices' alleged is tortious interference.").

Because the Amended Complaint is devoid of any well-plead allegation of improper means or motive, it does not state a claim against Carpenter and Copley for tortious interference, which also causes the respondeat superior claim against Wexner to fail.

### III. CONCLUSION

For the reasons explained above, the motion to dismiss [ECF No. 35] is <u>GRANTED</u> and the complaint is <u>DISMISSED</u> with prejudice.

**SO ORDERED.**

January 11, 2019    /s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE